Stanley B. and Alice T. BEECHER, Plaintiffs,

v.

UNITED STATES, Defendant.

No. 62 C 746.

United States District Court
N. D. Illinois, E. D.
Dec. 17, 1963.

Charles W. Davis, Jack C. Wood, Hopkins, Sutter, Owen, Mulroy & Wentz, Chicago, Ill., for plaintiffs.

Louis F. Oberdorfer, Asst. Atty. Gen., Edward S. Smith, David A. Wilson, Jr., L. Lee Phillips, Attys., Dept. of Justice, Washington, D. C., James P. O'Brien, U. S. Atty., for defendant.

PERRY, District Judge.

Plaintiffs seek in this action the refund of federal income taxes assessed and collected for the years 1957 and 1958.

A hearing was held in this matter at which the court heard testimony of witnesses and oral argument of counsel. The parties have entered into a stipulation of facts, with exhibits attached thereto, and have submitted briefs for the consideration of the court.

Very briefly, the facts are as follows:

Plaintiff Stanley B. Beecher (hereinafter sometimes referred to as "taxpayer") was employed by Graver Tank & Mfg. Co., Inc., a wholly-owned subsidiary of Phoenix Manufacturing Company and was a participating member of a profit-sharing plan (hereinafter called the "Plan") adopted by the Phoenix and Graver companies in 1951. It qualified in 1952 for tax exemption under Section 165(a) of the Internal Revenue Code of 1939.

The Plan was administered by an Advisory Committee and, pursuant to its terms, a trust was created to implement its administration. The affairs of the trust fund were administered by a trustee selected by the boards of directors of the employer-companies.

The Plan provided that contributions be made by both employees and employer-companies.

Each participating employee's contribution to the profit-sharing plan was withheld each month from his wages at the rate of 3% or until the maximum contribution of $240.00 had been withheld. As of December 31, 1956, taxpayer had made an aggregate contribution of $1,200.00. On the last day of each month beginning January, 1957 and ending in August, 1957, $25.50 was withheld from taxpayer's wages. On September 15, 1957 the final deduction was made from his wages in the amount of $12.75. His total contribution to the Plan was $1,416.75. (Stip., para. 19).

On July 17, 1957, Phoenix entered into a Memorandum of Agreement with Union Tank Car Company whereby the latter was to acquire, in exchange for a part of Union's voting stock, substantially all of the properties and business of Phoenix and was to assume all of

Phoenix's liabilities. All of the assets of Phoenix, except the stock of Graver, were to be transferred by Union to a new corporation for the purpose of liquidation.

The agreement provided that the Phoenix-Graver Profit-Sharing Plan was to be terminated.

On September 6, 1957, the employer-companies gave notice to the Trustee and the Advisory Committee of their election to discontinue contributions under the Plan, effective as to fiscal years beginning after December 31, 1956, and to terminate their connection with the Plan and the related Trust, effective September 9, 1957.

Union acquired the assets of Phoenix on September 9, 1957 and on the same day transferred all of them, with the exception of the Graver stock, to a newly organized Delaware corporation with the name of Phoenix Manufacturing Company. The new Phoenix carried on the business of the old Phoenix. The old Phoenix was liquidated after distribution of the stock of Union to its shareholders in return for the stock of Phoenix held by them. After the formation of the new Phoenix, Graver remained as a wholly owned subsidiary of Union, at least until the latter part of 1958. (Stip., para. 16).

On December 17, 1957, Graver employees received payments from the trust fund of which taxpayer's share was $3,818.00. On February 12, 1958, Graver employees received payments of which taxpayer's share was $4,267.11. (Stip., para. 15).

The dissolution of Graver into Union was approved by the Board of Directors of Union on November 26, 1958, and was effective as of the close of business December 31, 1958. Thereafter, Graver's business was operated as a division of Union. (Stip., para. 23).

In the income tax return filed for 1957, by plaintiffs, the 1957 distribution of $3,818.00 was treated by them as gain from the exchange of a capital asset, the amount contributed by plaintiff Stanley B. Beecher ($1,416.75), being treated as the basis of the asset.

In plaintiffs' return for 1958, the 1958 distribution of $4,267.11 was treated by them as additional gain from the exchange of a capital asset.

On June 14, 1960, the District Director of Internal Revenue in Chicago determined a deficiency of $315.25 in tax, plus interest of $55.17, a total of $370.43 for 1957, and a deficiency of $554.00 in tax, plus interest of $63.71, a total of $617.71 for 1958. Deficiencies, plus interest, were paid by plaintiffs on March 15, 1961.

Claims for refund for 1957 and 1958 and an amended claim for refund for 1958 were filed by plaintiffs and were disallowed by the Commissioner.

In support of their cause, plaintiffs advance two theories, the first of which is "that the payment made to Stanley Beecher upon the exchange of his Plan share falls squarely within the four corners of § 402(a) (2)."

Section 402(a) (2) of 26 U.S.C.A. reads, in pertinent part, as follows:

"§ 402. *Taxability of beneficiary of employees' trust*

"(a) *Taxability of beneficiary of exempt trust.*—

"(1) *       *       *       *       *

"(2) *Capital gains treatment for certain distributions.*—In the case of an employees' trust described in section 401(a), which is exempt from tax under section 501(a), if the total distributions payable with respect to any employee are paid to the distributee within 1 taxable year of the distributee on account of the employee's death or other separation from the service, or on account of the death of the employee after his separation from the service, the amount of such distribution, to the extent exceeding the amounts contributed by the employee (determined by applying section 72(f)), which employee contributions shall be reduced by any amounts theretofore distributed to him which were

not includible in gross income, shall be considered a gain from the sale or exchange of a capital asset held for more than 6 months. * * * "

Clearly, one of the requirements of Section 402(a) (2) is that the distribution to the employee must be made on account of his separation from the service.

■ It is the opinion of this court (a) that in this case taxpayer's separation from service did not occur until Graver was dissolved on December 31, 1958; and (b) that distribution was not made to taxpayer on account of his separation from service but was made pursuant to the termination of the profit-sharing plan. The plan was terminated on September 9, 1957.

It was brought out at the hearing that Union operated Graver Tank & Mfg. Co., Inc., as a separate corporation after September 9, 1957 and until December 31, 1958; that Union contemplated Graver's liquidation but there was no definite timetable and that liquidation was contingent on Union's being able to solve certain problems; that in the event Union had been unable to solve those problems, Graver would not have been liquidated.

■ Another requirement of Section 402(a) (2) is that the total distributions be paid to the distributee within one taxable year of the distributee. In this case one payment was made to taxpayer on December 17, 1957, and another was made on February 12, 1958. The court considers as unsubstantial the plaintiff's contention that the first payment was a loan. It is inescapable that two distributions were paid in two different taxable years of the taxpayer.

It appears that liquidation of the assets could not be accomplished before the end of the year 1957 because to do so might have involved a forced sale and a possible substantial reduction in proceeds.

In explanation of the situation, the Advisory Committee wrote on October 30, 1957, to Graver participants as follows:

"The First National Bank of Chicago is completing the sale of all securities held by the Phoenix-Graver Profit Sharing Fund. All cash is being temporarily invested in U. S. Government Notes.

"By decision of the Advisory Committee, the Fund is being revalued on October 31. This will take into account all participant's contributions through September 15, 1957, and will determine the share interest of each participant in the Fund when it is completely converted to cash.

"Graver participants will also receive their share of the Company contribution for the period from January 1 to September 9, 1957, which was the liquidation date for the Plan. Since this Company contribution may not be paid until January, it is necessary to pay the participants accounts in two installments. You will receive approximately fifty percent of your total amount (including the estimated amount of the 1957 Company contribution) about the middle of December, and the balance by a second check in late January or February. You will also receive a statement with the second check showing the sums you have contributed to the Fund, and the total amount of your account.

"A call will be issued in November for all profit sharing pass books. Your book will be posted with final figures and returned to you with your second check."

The court concludes that the requirements of Section 402(a) (2) were not met in this particular case and that therefore taxpayer is not entitled, under that section, to treat his gain as a capital one.

*Plaintiffs' Second Theory*

Plaintiffs contend that if the court should find that the payment made to

Stanley Beecher fails to come within the "safe harbor" of Section 402(a) (2), the gain which he realized should, nevertheless, be taxed as the gain from the sale or exchange of a capital asset held for more than six months.

The court agrees with and defendant does not dispute plaintiffs' contention that "if Section 402(a) (2) is not applicable Section 402(a) (1) provides that amounts paid to the distributee be taxed to him, in the year in which so distributed or made available, under Section 72 except that Section 72(e) (3) shall not apply."

Section 402(a) (1) of 26 U.S.C.A. reads in part:

"(a) *Taxability of beneficiary of exempt trust.—*

"(1) *General rule.*—Except as provided in paragraph (2), the amount actually distributed or made available to any distributee by any employees' trust described in section 401(a) which is exempt from tax under section 501(a) shall be taxable to him, in the year in which so distributed or made available, under section 72 (relating to annuities) except that section 72(e) (3) shall not apply. * * *"

However, plaintiffs' argument then continues:

(a) That Section 72(e) (1) (B) provides that the amount not received as an annuity by taxpayer "shall be included in gross income, but only to the extent that it * * * exceeds the aggregate premiums or other consideration paid;"

(b) That Section 63 of the Code provides that taxable income shall mean gross income minus the deductions allowed by Chapter One;

(c) That one of the allowable deductions is set forth in Section 1202 of the Code which provides that "[i]n the case of a taxpayer other than a corporation, if for any taxable year the net long-term capital gain exceeds the net short-term capital loss, 50 percent of the amount of such excess shall be a deduction from gross income. * * *"

(d) That the requirements for a long-term capital gain are set forth in Section 1222(3) and include:

(1) a holding period exceeding six months;

(2) a capital asset;

(3) a sale or exchange.

The theory is interesting but this court must agree with the defendant that it is untenable.

A distribution from a profit-sharing plan was, under Section 165(b) of the Internal Revenue Code of 1939, treated as if it were an annuity the consideration for which is the amount contributed by the employee.

Turning to 3 U.S.Code Cong. and Adm. News, p. 4929 we find that the Senate Finance Committee's Report and discussion of the Internal Revenue Code of 1954 contains the following language relative to Section 402:

"Except in the cases where capital gains treatment is provided, distributions by employees' trusts will, as under present law, be taxable as annuities."

■ Under Section 402(a) (1), the distributive payments made to taxpayer, under the facts in this case, are taxable as though they were annuities. The gain realized by taxpayer on the distributions was ordinary income.

■ Moreover, while the taxpayer's Plan share was a capital asset held by him for more than six months, the transaction whereby distributions were paid to him constituted neither a "sale" nor an "exchange," giving those words their ordinary meaning. There was, only a mutual relinquishment of rights under the Plan.

[5] The amount distributed to taxpayer which exceeded his contributions to the Plan represents the amount of income which was produced by taxpayer's capital asset and does not represent an increase in the value thereof. It must,

therefore, be accorded ordinary income treatment.

This memorandum of opinion will serve as Findings of Fact and Conclusions of Law under Rule 52(a), Federal Rules of Civil Procedure.

Judgment will be entered in accordance with this opinion.