UNITED STATES of America,
Appellant,

v.

William L. HAGGART and Marjorie
Haggart, Appellees.

No. 19197.

United States Court of Appeals
Eighth Circuit.

May 8, 1969.

Bennet N. Hollander, Atty., Dept. of Justice, Washington, D. C., for appellant; Mitchell Rogovin, Asst. Atty. Gen., and Lee A. Jackson and William A. Friedlander, Attys., Dept. of Justice, Washington, D. C., were with him on the brief.

J. Gerald Nilles, of Nilles, Oehlert, Hansen, Selbo & Magill, Fargo, N. D., for appellees.

Before MATTHES, MEHAFFY and HEANEY, Circuit Judges.

HEANEY, Circuit Judge.

The only issue on this appeal is whether the District Court erred in holding that the taxpayer's interest in a profit sharing trust was distributed to him because he was separated from the service of his employer within the meaning of §§ 402(a) (2) and 402(e), Internal Revenue Code, 1954, thus qualifying for preferential capital gains treatment.[1]

---

1. Section 402(a) (1) provides that distributions from qualified [§ 401(a)] tax exempt [§ 501(a)] funds are generally taxable under § 72 (relating to annuities) except as provided in § 402(a) (2) and (4). Thus, the distribution received by taxpayer will be taxed at ordinary income rates unless it qualifies for capital gain treatment under § 402(a) (2).

Northwest Motor Service Company was engaged in the business of maintaining and servicing truck and motor bus equipment. In 1949, it established a qualified profit-sharing plan—the Trust.

The taxpayer was a participant and beneficiary of the Trust. In 1953, Northwest discontinued its maintenance and service operations and leased its building and equipment to others. Thereafter, Northwest had three employees—the taxpayer (President and only compensated employee), his mother and his father.

On December 20, 1963, the Directors of Northwest—the taxpayer, his mother and his father—adopted a plan of reorganization. This plan called for the transfer of Northwest's net assets to the Virginia Corporation in exchange for Virginia stock. The Virginia stock was then to be distributed to Northwest's stockholders and Northwest was to be dissolved. Prior to the transfer, the taxpayer owned all of the Virginia stock.

Northwest notified the advisory committee to the trustee and the trustee that the statutory dissolution of the corporation was about to take place. The committee, acting pursuant to the trust agreement, directed the trustee to make lump sum payments to each beneficiary.[2]

On December 30, 1963, the trustee distributed the corpus of the trust to the taxpayer, his mother and three other employees whose employment had been terminated in 1953.

On December 31, 1963, the stockholders of Northwest (the taxpayer, his wife, his children and his father as trustee for the children) adopted the reorganization plan.

On January 3, 1964, the Virginia stock was distributed to Northwest stockholders and Northwest was dissolved.

The taxpayer reported the $32,000 received by him as an item of capital gain. The Commissioner determined that the distribution was taxable as ordinary income and sent the taxpayer a deficiency letter. The taxpayer, who had overestimated his tax, brought action in District Court for a refund.

The trial court, relying on Martin v. Commissioner, 26 T.C. 100 (1956) and Miller v. Commissioner, 22 T.C. 293 (1954), affd. per curiam, 226 F.2d 618 (6th Cir. 1955), held:

"This Court * * * recognizes the law to be that ' . . . if the former corporation [Northwest] continued in existence and the employee continues in its service there is no "separation from the service"' * * *

"[But] the taxpayer avoided [this pitfall].

\* \* \* \* \* \*

"In this case, it is clear that the employer corporation's [Northwest's] existence as a legal entity did in fact ter-

---

**2.** Article VIII of the trust instrument provides in part:

"(b) Upon termination or severance, whether voluntary or involuntary, of the employment with the Company of any participating employee, after two years of the date when such employee first became a participant, the interest of such employee in the Trust shall at once vest and determine, and the Trustee shall thereupon hold or distribute the amount then credited to such participating employee's account in such manner as the Advisory Committee may direct."

Article XXIII of the trust instrument vides:

The Company has established the Plan with the bona fide intention and expectation that it shall continue from year to year. However, the Company realizes that circumstances not now foreseen or circumstances beyond its control may make it either impossible or inadvisable to continue the plan.

"In the event the Board decides it is impossible or inadvisable to continue to make contributions as herein provided, the Board shall have the power to terminate the Plan by appropriate resolutions.

"In the event that the plan shall be so terminated, the Trustee shall distribute the fund to the participants in the relationship of their accumulated credits to the accumulated credits of all participants. Payment shall be made to each participant in the manner which the advisory committee shall direct."

minate; that the employer-employee relationship which had existed between it and the taxpayer had ceased; that the taxpayer's employment by the employer corporation had in fact terminated; that the taxpayer had separated 'from the service of the employer'; and that the distribution was made on account of the taxpayer's separation from such service. It is a fact that following separation from the service of Northwest—after dissolution of the corporate employer and after distribution of the subject fund— the taxpayer continued in his previous relationship with another corporation [Virginia] which had acquired the assets of the dissolved corporate employer. However, this Court is unable to read into the statute any effect such action would have upon the determination of the issue now before it."

We cannot accept the reasoning of the trial court. *Martin* and *Miller,* based as they are on pre-1954 Code provisions, are not controlling here.

The Code was amended in 1954 to meet problems raised in *Miller*-type situations.[3] Section 402(a) (2) was amended and a new § 402(e) was added. These sections now read:

"*(2) Capital gains treatment for certain distributions.*—In the case of an

employees' trust described in section 401(a), which is exempt from tax under section 501(a), if the total distributions payable with respect to any employee are paid to the distributee within 1 taxable year of the distributee on account of the employee's death or other separation from the service, * * *, the amount of such distribution, * * * shall be considered a gain from the sale or exchange of a capital asset held for more than 6 months. * * *

* * * * * *

"*(e) Certain plan terminations.*—For purposes of subsection (a) (2), distributions made after December 31, 1953, and before January 1, 1955, as a result of the complete termination of a stock bonus, pension, or profit-sharing plan of an employer which is a corporation, if the termination of the plan is incident to the complete liquidation occurring before the date of enactment of this title, of the corporation, whether or not such liquidation is incident to a reorganization as defined in section 368(a), shall be considered to be distributions on account of separation from service. * * *"

■■ A reading of the sections leads us to the same conclusion as that reached

---

3. Section 165(b) of the 1939 Code, as amended, provided in part:
"(b) Taxability Of Beneficiary.—The amount actually distributed or made available to any distributee by any such trust shall be taxable to him, in the year in which so distributed or made available, under section 22(b) (2) as if it were an annuity the consideration for which is the amount contributed by the employee, except that if the total distributions payable with respect to any employee are paid to the distributee within one taxable year of the distributee on account of the employee's separation from the service, the amount of such distribution to the extent exceeding the amounts contributed by the employee, shall be considered a gain from the sale or exchange of a capital asset held for more than 6 months. * * *"

In Miller v. Commissioner, 22 T.C. 293 (1954), aff'd per curiam, 226 F.2d 618 (6th Cir. 1955), the taxpayer's employer, Strouss-Hirshberg Company, had established a pension plan. Strouss-Hirshberg transferred all its assets and business to the May Company in exchange for May Company stock and was dissolved. The taxpayer, along with the other employees, continued to work in her same position but for a new employer—the May Company. Strouss-Hirshberg, in contemplation of its dissolution, terminated the pension plan and distributed the funds.

The Tax Court held that the former employees of Strouss-Hirshberg were entitled, under § 165(b), to capital gain treatment because the right to receive their distributive shares of the fund arose "on account of" their "separation from the service" of their employer.

by the Fifth Circuit in *United States v. Johnson*, 331 F.2d 943 (5th Cir. 1964):

" * * * *After 1954* distributions will not qualify for capital gain treatment if they are made as a result of the termination of a plan incident to a corporate reorganization, even if the corporate employer is completely liquidated. * * * In other words, after 1954 a separation from service would occur only on the employee's death, retirement, resignation, or discharge; not when he continues on the same job for a different employer as a result of a liquidation, merger or consolidation of his former employer. * * * "

*Id.* at 949.

This conclusion is supported by the legislative history of the 1954 amendments.[4] The House bill had extended:

" * * * capital gains treatment to lump-sum distributions to employees at the termination of a plan because of a complete liquidation of the business of the employer, such as a statutory merger, even though there is no separation from service. This was intended to cover, for example, the situation arising when a firm with a pension plan merges with another firm without a plan, and in the merger the pension plan of the first corporation is terminated."

Sen.Rep. No. 1622, 83rd Cong., 2d Sess., 54, 3 U.S.C. Cong. & Adm. News, pp. 4621, 4685 (1954).

The Senate bill eliminated:

" * * * the possibility that reorganizations which do not involve a substantial change in the make-up of employees might be arranged merely to take advantage of the capital gains provision. Thus, your committee's bill would grant capital gains treatment to lump-sum distributions occurring in calendar year 1954 where the termination of the plan is due to corporate liquidation in a prior calendar year.

The purpose of granting capital gains treatment to such distributions is to avoid hardship in the case of certain plans which it is understood were terminated on the basis of mistaken assumptions regarding the application of present law."

Sen.Rep. No. 1622, 83rd Cong., 2d Sess., 54, 3 U.S.C. Cong. & Adm. News, pp. 4621, 4685–4686 (1954).

The Senate version was accepted.

The result reached in *Johnson* was also reached in *United States v. Martin*, 337 F.2d 171 (8th Cir. 1964); *McGowan v. United States*, 277 F.2d 613 (7th Cir. 1960); *Nelson v. United States*, 222 F.Supp. 712 (D.Idaho 1963); and *Gittens v. Commissioner*, 49 T.C. 419 (1968).

The Tax Court suggested in *Gittens* that capital gains treatment should, despite the broad language of § 402(e), be accorded to distributions spawned by reorganizations involving substantial changes in the make-up of employees and more than technical changes in their employment relationship. A concurring minority in the same opinion would extend preferential treatment to those distributions fostered by reorganizations accompanied by meaningful changes in the beneficial ownership of the business.

It is unnecessary for us to decide whether §§ 402(a) (2) and 402(e) should be so extended. Here, there was no substantial change in the make-up of employees, there was only a technical change in the employment relationship, and there was no meaningful change in the beneficial ownership of the business.

■ The taxpayer argues that *Johnson*, *McGowan* and *Martin* are distinguishable on their facts. He points out that in each of the cited cases, the taxpayer had been and continued to be employed by the surviving corporation. Here, he had been employed by the corporation which lost its identity and his employment relationship ended when it was dissolved.

4. See *United States v. Johnson*, 331 F.2d 943 (5th Cir. 1964), for an exhaustive treatment of the legislative history of these sections.

We cannot accept this distinction. While each of the Courts supported their opinions by pointing out that no change of employment occurred, the Court, in *Johnson,* expressly rejected this distinction,[5] the *McGowan* Court did not express an opinion, and this Court characterized Judge Wisdom's opinion in *Johnson* as a "well-reasoned opinion, exhaustively [considering] the contentions here made."

Finally, the taxpayer correctly argues that his position is supported by Rev.Rul. 65–147, 1965–1 Cum.Bull. 180.[6] We could distinguish it on the grounds urged in *Gittens:* (1) that there has not been a substantial change in the make-up of employees, and (2) that there has not been more than a technical change in the employment relationship; but it is not necessary for us to do so here. Our decision here is compelled by the statute.

Reversed.

5. "Congress limited the concept of 'separation from service' because it feared that *corporate* taxpayers would abuse the law. The specific mischief Congress feared was the possibility that there might be a technical disappearance of a corporate entity in a tax-free reorganization not involving 'a substantial change in the make-up of employees'. It made no difference to Congress which way directors walked around the table, but they could not walk in a direction leading to abuse of the law and expect to receive favored treatment. * * * *"
United States v. Johnson, *supra* 331 F.2d at 951.

6. Revenue Ruling 65–147, 1965–1 Cum.Bull. 180 provides:
"The officers of X corporation, a shirt manufacturer, own its outstanding shares of stock and participate in the employees' pension plan and trust. The trust has been held to meet the requirements of section 401(a) of the Internal Revenue Code of 1954 and to be exempt from tax under section 501 (a) of the Code. X sold substantially all of its assets to an unrelated corporation which took over the shirt business and certain employees of X. The assets of X, including the sales proceeds, were transferred to Y, an operating real estate company, in accordance with a statutory merger under section 368

(a) (1) (A) of the Code. Prior to the merger, the officer-stockholders of X were also the officer-stockholders of Y. These officer-stockholders will continue their relationship with Y and some of the clerical personnel formerly employed by X will be employed by Y, but their duties will now be related solely to the real estate business. A lump-sum distribution was made of the total amounts standing to the credit of the participants in the pension plan, including the officer-stockholders and the clerical personnel. "*Held,* under these circumstances, the ownership of both X and Y by the same officer-stockholders is not such a relationship of the companies that would prevent the officers and clerical personnel employed by Y from being 'separated from the service' of X within the meaning of section 402(a) (2) of the Code and Revenue Ruling 58–383, CB. 1958–2, 149. Therefore, a distribution to any of the employees within one taxable year, of the total amount due them under the trust is considered to be a long-term capital gain, to the extent it exceeds the amount contributed by the employees."
For a comprehensive analysis of the earlier revenue rulings discussing the taxability of a beneficiary under a qualified trust, see United States v. Johnson, *supra.*